UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

Yu Sung Park,
     Petitioner/Defendant,

  vs.

United States of America,
     Respondent/Plaintiff.

§
§
§
§
§
§
§
§
§
§
§
§

No. 8:08-CR-00197 (AG)
No. 8:14-CV-678 (AG)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITION TO VACATE, SET ASIDE, OR CORRECT SENTENCE
PURSUANT TO 28 U.S.C. § 2255

Comes now, Yu Sung Park, hereinafter "Petitioner," and respectfully submits this Memorandum of Point and Authorities in support of his previously filed petition under 28 U.S.C. § 2255. Petitioner humbly requests that this Honorable Court grant him the relief he seeks herein for the reasons discussed forthwith or, at a minimum, to grant him an evidentiary hearing so that he may further establish the veracity of his claims.

## I.    Jurisdiction and Timeliness

This Court has jurisdiction pursuant to 28 U.S.C. § 2255. The petition was timely filed under the provisions of same.

## II.   Procedural Background

Petitioner was convicted on four separate counts: (1) 18 U.S.C. § 1951(a) -- Interference with Commerce by Threats or Violence; (2) 18 U.S.C. § 924(g) -- Interstate Travel to Commit a Robbery With a Firearm; (3) 18 U.S.C. § 924(c)(1)(A),(B) -- Using a Machinegun During and in Relation to a Crime of Violence; and (4) 18 U.S.C. § 922(o) -- Unlawful Possession of a Machinegun. A jury returned a guilty verdict on March 18, 2009, where-

upon Petitioner was sentenced to 360 months imprisonment on April 26, 2010.

On May 24, 2012, the Ninth Circuit Court of Appeals affirmed the convictions.  See United States v. Yu Sung Park, 473 Fed. Appx. 706 (9th Cir. 2012) (unpublished).  On April 15, 2013, the United States Supreme Court denied a petition for writ of certiorari.

## III.   Factual Background

Before proceeding, Petitioner must point out that the facts of this case are inextricably intertwined with those of his co-defendant and former FBI Special Agent Vo Tran ("Tran").  See Case No. 14-CV-605 (AG).  Tran recently filed his own habeas petition and a brief discussion is necessary to fully comprehend the underlying circumstances and properly evaluate the legal issues.

## A.   Petitioner's Codefendant's History

Petitioner's situation is simple but tragic -- he was a victim of happenstance and his friendship with Tran.  Specifically, unbeknownst to Petitioner, Tran was the centerpiece of an agonizingly prolonged but increasingly frustrated witch hunt being conducted by the FBI, which stemmed, initially, from Tran's refusal to divulge the details of his (Tran's) participation in a special U.S. Senate investigation into corrupt political financing.

The FBI proceeded to derail Tran's career internally through retaliatory, sham OPR (Office of Professional Responsibility) "investigations."  Tran fought back, filing several civil complaints alleging employment discrimination.  The FBI escalated and countered by placing Tran on administrative leave in 2001.  Ironically,

while on leave, Tran learned of a planned home-invasion robbery
in the Chicago area and attempted to warn the intended victims,
which, it should be noted, stands in stark conflict with the
government's allegations in this case that Tran was, himself,
prone to commit such crimes.  In any event, the state jury saw
through the government's vitriol for Tran and acquitted him of
impersonating a peace officer in connection with the aforementioned
Chicago incident.

Undeterred, the FBI terminated Tran and, contemporaneous
with Tran's pending employment litigation in federal court, pressed
criminal charges in the U.S. district court of Georgia.  Those
charges were ultimately dismissed because the FBI agents involved
in that investigation lied to the federal judge during their
testimony about the case.  Strike two.

Despite the FBI's terror campaign, Tran nevertheless managed
to become a successful business entrepreneur by opening numerous
Verizon wireless franchises.  As for the FBI, their resolve to
crush Tran was steeled all the more, and, immediately following
their failed Georgia proseuction, they began a twenty-two (22)
month investigation of Tran's "organization" using "sophisticated
investigative techniques."  Record Transcript ("RT") 02/25/09
at pp. 63-66.  Not surprisingly, this "investigation met with
negative results."  Ibid.  Strike three.

In a final measure of desperation and stroke of evil genius,
the FBI decided to play on Tran's own morality and desire to
resume his law enforcement career by enlisting the assistance
of professional snitch and career criminal, Alex Dao ("Dao").
The FBI knew Tran couldn't resist the temptation to privately

3

investigate Dao, as their failed Chicago prosecution had shown
them. They weren't disappointed. Over the next six (6) months,
Dao goaded and baited Tran to participate in a wide variety of
criminal ventures, including identity fraud, extortion, drug
distribution, illegal firearm distribution, and even robbery
-- all of which Tran declined. See, e.g., RT 03/10/09 at p.
175; RT 03/06/09 at p. 158; and RT 02/25/09 at pp. 149-50. Fin-
ally, Dao convinced Tran to begin planning, in principle but
with no specific details, the commission of a home-invasion robbery
of an alleged drug "stash" house.

B.    **Petitioner's Involvement in the Scheme**

Petitioner's alleged role in this ficticious, victimless
scheme consisted primarily of receiving approximately $3,000
in money order receipts, at the behest of Tran, from Dao to,
allegedly, purchase bullet proof vests; though Petitioner was,
to that point, completely unknown to the FBI as a suspect in
any capacity. Petitioner also participated in a single, recorded
meeting in a hotel room with Dao, Tran, and an undercover FBI
agent, wherein Petitioner discusses how the group might enter
the fake "stash" house, along with other vague braggadocio regarding
Petitioner's own alleged experience with such endeavors. This
was the gravamen of the defense theory, i.e., that all conversations,
by Tran or Petitioner, were merely "puffing" in an effort to
gain Dao's trust. A ruse, nothing more.

C.    **Outrageous Government Conduct**

Defense counsel failed to highlight and challenge the govern-
ment's misconduct as it related to this entire ordeal, nor has
the issue been properly raised in the instant habeas petition.

However, this writer is obligated to briefly explain why the entire premise of this case warrants application of this Court's inherent remedial powers.

Since these ficticious, government created crimes began to gain popular traction among law enforcement groups, criticisms have abounded. In the all too common circumstance, police troll through the most impoverished areas of any given community and offer fantastic promises of wealth, if only the unwary victims are willing to risk their lives by robbing a drug dealer's "stash" house. In this way, the poor and dispossessed are seduced by a government meant to protect them and, all too often, "without an iota of suspicion that any particular person has committed similar conduct in the past." United States v. Hudson, 2014 U.S. Dist. LEXIS 33952 (C.D. Cal., March 10, 2014).

Judge Wright's salient critique of this type of despotism bears repeating:

> In these stash-house cases, the [g]overnment's "participation in the offense conduct" is what makes them particularly repugnant to the Constitution. Everything about the scheme -- and therefore almost everything bearing upon a defendant's ultimate sentence -- hinges solely on the [g]overnment's whim. Why were there not 10 kilograms in the stash house? Or 100? Or 1000? Why were the guards allegdly armed -- necessitating that Defendants bring weapons with them? All of these factors came down to the [government] and the undercover agent alone. That sort of arbitrariness offends the Constitution's due-process demands.

Id. (citations omitted).

The problems noted by Judge Wright in Hudson are even more pronounced in this case here. For instance, in Hudson, it was the primacy of the government's failure to "indicat[e] that the [government] ... had any knowledge of [the defendants'] alleged

'criminal background or propensity' prior to [the government] inventing the stash-house scheme[,]" id., that concerned Judge Wright.  But this seems constitutionally tame compared with a case where the government just completed a twenty-two (22) month investigation into an allegedly suspected individual that, in the FBI agent's own trial testimony, "met with negative results," RT 02/25/09 at pp. 63-66, i.e., didn't reveal any evidence of criminal activity; this, immediately preceded by two FBI agents perjuring themselves in another federal criminal prosecution in an effort to gain a conviction.  Let that settle in -- 22 months.  No criminal activity uncovered.  FBI agents lying to a federal judge.

To their credit, the FBI realized its ineptitude for perjury during their failed Atlanta prosecution.  But the government would spare no expense to compensate, hiring a professional liar, snitch, and veteran criminal (prior crimes including illegal machinegun trafficking) to succeed in evading the truth and justice demanded by our constitution where they had failed -- Dao; "negative" results of a two-year investigation be damned.

Here, as in Hudson, "[b]ut for the undercover agent's imagination in this case there would be no crime.  [Dao] ... invented ... the stash house, the [amount] of cocaine supposedly inside the stash house, the [] individuals supposedly guarding the stash house, the need to use weapons, and the idea of robbing the stash house." Hudson, ibid.  "[T]he [government] manufactured this entire crime.  It did not infiltrate an ongoing criminal enterprise, as there was no indication that [Petitioner and Tran] had any previous criminal affiliation between them."

6

Ibid.  Exacerbating the complete lack of criminal propensity
was the fact that Petitioner was earning approximately $60,000
a year as a manager for one of Tran's Verizon franchises, while
Tran himself revenued over $800,000 in 2007 and had over $300,000
in various bank accounts at the time the pair was arrested --
all from Tran's legitimate, lawful Verizon franchises.  Of course,
the government confiscated all of Tran's business records from
his home and never returned them.  But this begs the all impor-
tant question never raised by counsel in this case.  Why would
a former FBI agent earning nearly a million dollars a year agree
to commit a home-invasion robbery where his "take" was around
$50,000, at best?  It's easy to understand why a group of destitute
individuals like the defendants in Hudson would agree to commit
a financially irresistable robbery that, itself, can't be reported
to the police, especially considering the pervasive racist ass-
umptions which still linger in our society.  Here, by contrast,
the entire premise of the government's case is absurd on its
face.

Nor can the government argue that Petitioner has no standing
to complain of this outrageous misconduct "because he was not
the 'actual target' of the [g]overnemnt's operation[,]" Hudson,
id., since, like Hudson, "the undercover agent in this case ...
asked [Tran] whether [he] had '... other associates' who could
partake in the fake stash-house robbery." Ibid.  Indeed, the
law necessitated that the government urge Tran to bring Peti-
tioner into the scheme.  See, e.g., Sears v. United States, 343
F.2d 139, 142 (5th Cir. 1975) ("[A]s it takes two to conspire,
there can be no indictable conspiracy with a government informer

[i.e., Dao] who secretly intends to frustrate the conspiracy.").
So, "it was [Dao]'s continual badgering to include more members
in [Tran]'s crew that resulted in [Petitioner]'s ... involvement
in this ficticious plan." Hudson, id.; see also RT 03/06/09
at p. 133.

Procedural deficiencies aside, this Court is the guardian
of justice and fairness, the last bastion for citizens seeking
refuge from tyranny.  Countless Americans have sacrificed their
lives at the altar of liberty so that we may be free from the
type of perverse Orwellian overreaching perpetrated by the government
here.  As this Court is aware, it retains broad authority to
correct injustice.  See, e.g., United States v. Barrera-Moreno,
951 F.2d 1089, 1091 (9th Cir. 1991) (court may exercise inherent
supervisory power "to remedy a constitutional or statutory violation;
to protect judicial integrity ...; or to deter future illegal
conduct").  If ever there was such a moment, it is here.

D.    Plea Negotiations

Prior to trial, Petitioner's attorney, Yolanda Barrera
("Barrera"), relayed a plea offer by the government that included
a stipulated 20-year sentence under Fed.R.Crim.P. 11(c)(1)(C).
Exhibit ("EX") 1, p. 1, ¶¶ 3-4.  Petitioner declined the government's
offer because the penalty was too severe.  Id. at ¶ 5.

After trial, but prior to sentencing, Barrera admitted to
Petitioner that, at the very beginning of the trial, AUSA Ivy
Wang ("AUSA Wang") approached her (Barrera) and asked if Petitioner
would become a government witness in exchange for leniency.
Id. at ¶ 7.  Barrera further confessed to having delcined AUSA
Wang's offer without ever notifying Petitioner of its existence.

8

Id. at ¶ 8.

IV.    **Analysis**

A.    **The Government Violated Petitioner's Due Process
      Rights by Withholding Material Information Re-
      garding its Informant**

Under the landmark case of <u>Brady v. Maryland</u>, 373 U.S. 83,
87 (1963), prosecutors are constitutionally obligated to disclose
"evidence favorable to an accused ... [that] is material either
to guilt or to punishment."  This duty derives from the Fourteenth
Amendment, id. at 86, which instructs that government shall not
"deprive any person of life, liberty, or property, without due
process of law."  U.S. Const. amend. XIV, § 1.  The touchstone
of <u>Brady</u> and its progeny is to ensure that "criminal trials are
fair," <u>Brady</u>, 373 U.S. at 87, and "that a miscarriage of justice
does not occur," <u>United States v. Bagley</u>, 473 U.S. 667, 675 (1985).
Hence, placing this disclosure burden on the government "illustrate[s]
the special role played by the American prosecutor in the search
for truth in criminal trials." <u>Strickler v. Greene</u>, 527 U.S.
263, 281 (1999).  The prosecution is trusted to divulge evidence
to defense counsel because its interest "is not that it shall
win a case, but that justice shall be done."  Id. (quoting <u>Berger</u>
<u>v. United States</u>, 295 U.S. 78, 88 (1935)).

The prosecution's duty to reveal relevant information is
a "broad obligation." <u>Strickler</u>, 527 U.S. at 281.  Although
"not required to deliver [their] entire file to defense consel,"
the prosecutor must disclose information/evidence that is both
favorable to the defendant and material to the case. <u>Bagley</u>,
473 U.S. at 675.  Furthermore, this duty exists regardless of
whether the defense made any request of the prosecution; the

9

prosecution is required to provide material, favorable information even "where the defendant does not make a Brady request." Id. at 680-82.

Favorable evidence includes impeachment material. For example, in Giglio v. United States, 405 U.S. 150, 154 (1972), "the Government's case depended almost entirely" on a single witness, yet the prosecution failed to inform the defense that the witness testified in exchange for a promise from the government that he would not be prosecuted. The Supreme Court held that the prosecution was required to inform the defense about the agreement with the witness because "evidence of any understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility and the jury was entitled to know of it," and the High Court ordered a new trial. Id. at 154-55. The Supreme Court has since explained that the prosecution must disclose all material impeachment evidence, not just evidence relating to cooperation agreements. See Bagley, 473 U.S. at 676.

Here, the government's entire case hinged on the interactions between Dao and Tran, with Petitioner's lone conversation merely peripheral and the culmination of those dealings. In fact, the government had recorded, through Dao, hundreds of conversations between Dao and Tran, only a fraction of which were introduced at trial. It was those conversations that represented the only real circumstantial evidence against Petitioner. Yet, despite the importance of Dao's interactions/conversations, and in spite of the prosecutor's repeated representations that Dao would be called to testify (e.g., RT 02/17/09 at p. 39), his testimony, indeed presence, was conspicuously absent. Worse, all defense

objections and complaints regarding the government's misdirection were dismissed by this Court because Dao, according to the prosecutor, was "available" as a witness.   RT 03/10/09 at p. 6.

After trial, Petitioner learned that Dao had filed a complaint in the U.S. Court of Federal Claims (Trung "Alex" Dao v. The United States, No. 10-461C ("Dao Complaint")) alleging that the government had promised to, inter alia, pay him $500,000 plus expenses and place him in witness protection in connection with Petitioner's case.   Most importantly, Dao alleged that the government breached the contract because AUSA Robert Keenan ("AUSA Keenan") "knowingly and willfully disclos[ed] [Dao's] true identity to the public and the press" during Petitioner's voir dire.   EX 2, p. 5, ¶ 23.   In fact, AUSA Keenan "acknowledged to [Dao] that AUSA Keenan had 'fucked up' by releasing [Dao's] true name and identity to the press."   Id., pp. 5-6, ¶ 24.

Further revelations from the Dao Complaint included (1) the fact that Dao had previously been an informant in a home-invasion robbery case; (2) the inability of the FBI to "infiltrate [] Tran's inner sanctum, in order to obtain evidence necessary to bring an indictment[,]" implying that Dao knew of the FBI's prior efforts to prosecute Tran; and (3) the FBI's belief that Dao was "associating with persons of questionable character[,]" and that he (Dao) was being extorted -- presumably by those same people.   EX 2, pp. 3, 34, ¶ 13.   With these details, it becomes obvious why the government lied at trial about calling Dao as a witness.   Even without evidence of the FBI's raging vendetta against Tran, the prosecutors were loathe to inform the jury that they had recruited a professional home-invasion set-up artist

to the tune of more than half a million dollars, and who himself
was likely being extorted; not to mention AUSA Keenan's "fuck[]
up[,]" id., pp. 5-6, ¶ 24, which caused their relationship with
Dao to implode.

"The Brady rule requires prosecutors to disclose any benefits
that are given to a government informant, including any lenient
treatment[,]" Benn v. Lambert, 283 F.3d 1040, 1057 (9th Cir.
2001) (internal citation omitted), because:

> Disclosure of an agreement to provide such benefits,
> as well as evidence of the benefits themselves, could
> ... allow[] the jury to reasonably conclude that [the
> informant] ha[s] a motive other than altruism for
> testifying on behalf of the [government]. Such a fin-
> ding could ... substantially impeach[] [the inform-
> ant's] credibility ....

Singh v. Prunty, 142 F.3d 1157, 1162 (9th Cir. 1998); see also
Carriger v. Stewart, 132 F.3d 463, 481-82 (9th Cir. 1997) (en
banc) (holding that government "is obligated to disclose all
material information casting a shadow on a government witness's
credibility") (internal citations and quotations omitted).  Clearly,
the facts contained within the Dao Complaint fall within Brady's
ambit and should have been disclosed.

Nor can the government seek refuge behind the fact that
Dao did not testify.  In United States v. Kojayan, 8 F.3d 1315
(9th Cir. 1993), exactly like this case here, the government
had elected to introduce an informant's statements (both taped
and untaped) through an DEA agent to convict the defendant of
narcotics charges.  Id. at 1316-17.  The defense had "tried hard"
to learn of any cooperation agreement between the government
and informant and, because the government insisted it was not
required to disclose the existence of any agreement, it urged

12

the jury to infer that such an agreement did exist.  Id.  Similarly, here, counsel repeatedly attempted to obtain all information relevant to Dao's cooperation and compensation, particularly after subtle indications by the government that it would not call Dao.  RT Vol. III at pp. 227-30.  The only real difference between Kojayan and this case lay in the fact that AUSA Keenan deceived this Court and the defense by maintaining that the government had fully disclosed all such information, ibid., whereas, in Kojayan, the prosecutor simply resisted disclosure altogether.

Largely because of the circumstances described in the Dao Complaint, "[AUSA Keenan] made a strategic decision to present [Dao]'s evidence by way of hearsay, and then did everything he could to keep the defense from learning ... []about[] ... the existence and nature of [Dao's] cooperation agreement.  While [there's no reason] to second-guess the government's decision not to bring [Dao] to court, [there's] no justification for [Keenan]'s refusal to give the defense whatever information he had about [Dao] -- ...  the nature and extent of any cooperation agreement."  Kojayan, 8 F.3d at 1323.  The resultant prejudice is clear and multifaceted:

> Evidence matters; [opening] argument matters; statements from the prosecutor matter a great deal.  [Keenan] deprived the defendants of an opportunity to put on what could have been a powerful defense.  See United States v. Agurs, 427 U.S. 97, 103 ... (1976) (where prosecutor knowingly uses perjured testimony, error isn't harmless unless there's no reasonable likelihood that the misconduct affected the verdict).

Id. at 1323-24.

Essentially, Keenan's deprivation robbed Petitioner of the opportunity to tell his jury the uncomfortable and grotesque

fact that the government paid Dao over $500,000 to set him up, that Dao was aware of the FBI's previous attempts to "infiltrate," i.e., set-up, Tran and his "associates," i.e., Petitioner, and that Dao was socializing with extortionate-type gangsters, and that Dao had previously assisted the government with a home-invasion robbery investigation, all of which necessarily impacted the jury's verdict because "the extent to which it mattered that [Dao] may have had an incentive to ... [engage in] ... the undercover operation because of his fee arrangement could [**not**] be measured by the jury against the evidence of [Petitioner's] guilt." United States v. Cuellar, 96 F.3d 1179, 1183 (9th Cir. 1996).

Finally, Petitioner respectfully requests that he be allowed to engage in discovery, given the details contained within the Dao Complaint, so that this Court may review all materials, whether exculpatory or impeaching, which should have been disclosed to him under Brady.

B.     **Trial Counsel Rendered Ineffective Assistance by Failing to Advise Petitioner of the Government's Offer to Become a Cooperating Witness**

"[C]riminal justice today is for the most part a system of pleas, not a system of trials.... [T]he right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions and determining sentences." Lafler v. Cooper, 132 S.Ct. 1376, 1388 (2012). Due to the "reality [] that plea bargains have become so central to the administration of the criminal justice system ...," Missouri v. Frye, 132 S.Ct. 1399, 1407 (2012), the Supreme Court has recognized that the Sixth Amendment right to counsel "extends to the plea-bargaining process. During plea

14

negotiations defendants are entitled to the effective assistance of competent counsel." Lafler, 132 S.Ct. at 1384 (internal citations and quotations omitted); see also Frye, 132 S.Ct. at 1407.

As already discussed, counselor Barrera advised Petitioner that AUSA Wang approached her almost immediately after the trial began and offered Petitioner the opportunity to become a testifying witness -- a quid pro quo not present in the government's initial December 17, 2008, plea offer. EX 1, p. 1, ¶ 7. On her own volition, Barrera rejected the government's offer without ever having advised Petitioner of its existence. Id. at ¶ 8. To be sure, that AUSA Wang would have extended Petitioner the opportunity to become a cooperating/testifying witness makes perfect sense given the circumstances described in the Dao Complaint. The government was obviously concerned that, if its ruse to sneak Dao's evidence past this Court and the defense was uncovered, there would be no witness and no case because AUSA Keenan "fucked up" by, inter alia, exposing Dao to the world as an FBI snitch -- effectively terminating their relationship. The prosecutors needed an emergency backup plan. Enter Petitioner as a potential testifying witness for the government and AUSA Wang's offer to Barrera.

Clearly, Barrera should have conveyed AUSA Wang's offer to Petitioner. In fact, the circumstances of Petitioner's claim here highlight the difficulties faced by defendants when their attorneys provide this sort of deficient representation. See, e.g., Frye, 132 S.Ct. at 1407 ("When a plea offer has lapsed or been rejected ... no formal court proceedings are involved.

15

This underscores that the plea-bargaining process is often in flux, with no clear standards or timeliness and with no judicial supervision of the discussions between prosecution and defense.").

Nor is it relevant that AUSA Wang's offer was informal. Logically, the nascency of AUSA Wang's offer to Petitioner, through Barrera, was borne of AUSA Keenan's "fuck[] up," EX 2, pp. 5-6, ¶ 24, in exposing the snitch status of their star trial witness. The Frye Court did not explicitly or implicitly limit its holding to formal, written plea offers. Compare Frye, 132 S.Ct. at 1407 ("plea bargains have become so central to the ... criminal justice system that defense counsel have responsibilities in the plea bargain **process**" (emphasis added)), with id. at 1408 ("as a **general** rule, defense counsel has the duty to communicate **formal** offers from the prosecution ..." (emphasis added)); see also Kovacs v. United States, 744 F.3d 44, 52 (2nd Cir. 2013) ("The proper focus is not on the specific test applied in ... Frye; each case is a context-specific application of Strickland directed at a particular instance of unreasonable attorney performance."). Indeed, the Supreme Court has "long recognized that the **negotiation** of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." Padilla v. Kentucky, 559 U.S. 356, 373 (2010) (internal citation omitted) (emphasis added).

The Fourth Circuit recently encountered a very similar situation in Merzbacher v. Shearin, 706 F.3d 356 (4th Cir. 2013). There, the panel did not foreclose the application of Frye to informal plea agreements, but rather acknowledged that "there may be cases in which a petitioner can show Strickland prejudice

16

despite the incipience of the plea offer he did not accept[.]"
Id. at 369-70.  While the Fourth Circuit admitted a "lack of
definition in the plea offer" made it difficult to know whether
the plea would have been adopted, the court also found "signi-
ficant evidence weighed against finding the petitioner and the
prosecutor would have agreed on a plea" and ultimately denied
the writ because the petitioner had failed to demonstrate a rea-
sonable probability the plea would have been entered and adopted.
Id. at 370.

In the present case, Petitioner rejected the government's
initial, formal plea offer because the resultant sentence, twenty
(20) years, was too severe.  EX 1, p. 1, ¶ 5.  Had Petitioner
known of AUSA Wang's offer to turn government witness, he would
have accepted it.  Id. at ¶ 10.  Furthermore, there can be no
doubt that the government would not have withdrawn the offer,
as Petitioner's testimony at trial would have been invaluable
to the prosecution.  Nor does this Court need any legal citation
to understand that Petitioner would certainly have received sig-
nificantly less prison time had he testified on behalf of the
government at trial.  Frye, 132 S.Ct. at 1409 (to show prejudice
petitioner must demonstrate "a reasonable probability that the
end result of the criminal process would have been more favorable
by reason of ... less prison time").  Indeed, this Court engaged
in a downward departure at Petitioner's sentencing, described
by the prosecutor as "unprecedented," in order to limit Petitioner's
sentence to thirty (30) years, simultaneously expressing its
hopefulness that this would be the first and last 30-year man-
datory minimum sentence it was required to impose.  At a minimum,

Petitioner should be allowed an evidentiary hearing to develop a record to show a reasonable probability his sentence would have been less had he pleaded guilty with the benefit of being a cooperating witness for the government.

## V.        Conclusion

For the reasons discussed herein, Petitioner humbly requests this Court enter an Order vacating his convictions because they were procured in violation of the Fifth, Sixth and Fourteenth Amendments.

Respectfully submitted,

Yu Sung Park
Reg. No. 47513-112
FCI Greenville
P.O. Box 5000
Greenville, IL 62246

## CERTIFICATE OF SERVICE

I, Yu Sung Park, do certify that I have sent one (1) original of the foregoing "Memorandum of Points and Authorities in Support of Petition to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255," to the Clerk of the Court, United States Courthouse, 411 West Fourth Street, Room 1-053, Santa Ana, California, 92701, by depositing same in the mail receptacle here at my present prison of confinement on this _14th_ day of November, 2014, with sufficient postage affixed thereon to ensure its first-class delivery.

Respectfully submitted,

Yu Sung Park
Reg. No. 47513-112
FCI Greenville
P.O. Box 5000
Greenville, IL 62246

19

# EXHIBIT 1

## Declaration and Affirmation
## YU SUNG PARK

I, Yu Sung Park, a federal prisoner currently incarcerated at the Federal Correctional Institution in Greenville, Illinois, do hereby duly swear, state and declare the following facts, to wit:

1. In or around July of 2008, I was indicted federally for various crimes stemming from my alleged involvement in a ficticious planned robbery.

2. I retained attorney Yolanda Barrera ("Barrera") to defend against said charges.

3. In or around December of 2008, Barrera visited me in the Santa Ana Jail to discuss a plea offer the government had made to resolve the charges against me.

4. Barrera advised me that if I accepted the government's plea offer, I would receive a sentence of twenty (20) years imprisonment.

5. Barrera further advised that the plea would have no effect on my codefendant.  I indicated that the proposed sentence was too severe for me to accept a guilty plea and decided to reject the government's offer.

6. After my trial but prior to sentencing, in or around July of 2009, Barrera sent me a letter to let me know that she wanted to give me some time to "decompress" after the guilty verdict. Her letter also indicated that she would be visiting me to discuss the contents of my Pre-Sentence Report since we were to meet with the probation officer to "fill out some paperwork."

7. In late July or early August of 2009, Barrera visited me at the Santa Ana Jail.  During that visit, Barrera admitted that, rith at the very beginning of my trial, Assistant United States Attorney Ivy  Wang confronted her (Barrera) at the court house and offered to allow me to become a witness for the government in exchange for leniency.

8. Barrera admitted that she declined the prosecutor's offer for leniency without ever consulting me and explained that her decision to do so was based on my previous rejection of the government's prior twenty (20) year plea offer.

9. I was never consulted by Barrera, or anyone else, regarding the government's offer to become a cooperating witness in exchange for leniency.

10. Had I been advised properly of the government's offer to become a witness, I would have accepted.

I, Yu Sung Park, declare under the penalty of perjury, pur-
~~ant to Title 28 United States Code § 1746, that the foregoing
· true, accurate, correct, prepared to the best of my knowledge
~d recollection, and made for no improper reasons.


.ted: _11/14/14_____                    Executed:

                                             _____
                                             Yu Sung Park
                                             Reg. No. 47513-112
                                             FCI Greenville
                                             P.O. Box 5000
                                             Greenville, IL 62246

# EXHIBIT 2



```
                                    FILED
                                 JUL 16 2010
                               U.S. COURT OF
                              FEDERAL CLAIMS
```

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TRUNG "Alex" DAO,        )   CIVIL ACTION FILE NO.
                         )
     Plaintiff,          )   _____
                         )
     vs.                 )   10-461 C
                         )
THE UNITED STATES,       )
                         )
     Defendant.          )
                         )
                         )
_____)

**COMPLAINT**

I.   INTRODUCTION

1.   This action seeks just compensation from the
United States for breach of contract and consequential
damages directly arising there from related to Plaintiff's
work as an undercover informant for the Department of
Justice, Federal Bureau of Investigation.

II.   JURISDICTION

2.   This court has jurisdiction to hear claims in
which the United States is mandated to pay money including
but not limited to claims based upon express contracts to
pay money to a party or based on contracts implied-in-fact
and the "Tucker Act." 28 U.S.C. § 1491(a)(1)(2006); *E.g.*,
Gould, Inc. v. United States, 67 F.3d 925 (Fed.Cir.1995).
Additionally, this Court has jurisdiction pursuant to the
Tucker Act and the Attorney General's Guidelines on Use of
Confidential Informants issued in 2001 and 2002
("Guidelines") promulgated pursuant to the Attorney

1

General's authority as provided in sections 509, 510, and 533 of Title 28, United States Code.  The Guidelines provide authority and mandates for monetary payments to confidential informants.

III.   PARTIES

3.   Plaintiff is a United States citizen and legal resident of the State of California.  He is using a pseudonym name in the caption and acting through his attorneys.

4.   The Defendant is the United States of America.

IV.   FACTUAL BACKGROUND

5.   In 2003, Plaintiff began working with the FBI after completion of a successful operation with the Fountain Valley, California Police Department wherein Plaintiff was approached to assist with a murder investigation that occurred during a home invasion.

6.   The suspect in this murder investigation was subsequently arrested and prosecuted due to Plaintiff's undercover informant activities during another home invasion.

7.   After this arrest and prosecution, the FBI approached Plaintiff and asked him if he would work with them on other criminal investigations.

8.   The first FBI agent to approach Plaintiff was Special Agent Khan Nguyen, and the referring officer of the Fountain Valley Police Department was Officer Vern Ahlo.

2

9.   Plaintiff was subsequently worked with Special
Agent Khan Nguyen to FBI Special Agents Demetrius "Nick"
Laloudakis and Andrew Choi.

10.  From 2003 through 2007, Plaintiff worked with
four to ten different agents and other agencies on various
federal criminal investigations regarding political fraud,
environmental terrorism, white collar crimes, and mainly
gang activity in the southern California area including
agents from the Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF).

11.  The FBI began an investigation of a former FBI
Special Agent from their Chicago field office named Vo
Duong "Ben" Tran, code-named "BLT".  Mr. Tran was believed
to be affiliated with known Asian gangs in southern
California, was suspected of murdering a couple in Chicago,
and was also suspected of engaging in armed home invasions
of purported drug houses in an effort to illegally obtain
money and other items.

12.  The Defendant found Mr. Tran a difficult suspect
to investigate given his long tenure with the FBI as a
special agent.  Tran's law enforcement background also
aided him and others in the planning of crimes and evading
other undercover agents.

13.  The FBI was unable on its own to infiltrate Mr.
Tran's inner sanctum in order to obtain evidence necessary
to bring an indictment and ultimately prosecute Mr. Tran
for his violent crimes.

14.  FBI agents sought Plaintiff's assistance in
investigating and prosecuting Mr. Tran due to Plaintiff's
current business ties to the Asian community, close
relationships to the numerous Asian gangs, and ultimately

3

Petitioner's Exhibits
Page 3

Dao's tenure and respect he's earned while working with the FBI and striving to build his businesses. The Plaintiff had assisted the Government in the past in prosecuting dangerous people and it was foreseeable that release of his identity as a confidential informant would jeopardize his safety.

15.  If it was discovered that the Plaintiff was an undercover agent, it was foreseeable that plaintiff would be in extreme jeopardy and would have to give up his businesses and properties, move, and begin a different life. It was foreseeable by the parties that exposure of his identify would expose him to danger from different persons the Government had investigated or prosecuted, not only Tran. The Plaintiff agreed to be a confidential informant performing actions needed to gain evidence concerning Tran and, if necessary, to testify.

16.  In consideration for the Plaintiff's agreement and cooperation, and in light of the extreme jeopardy he would be placing himself in, the FBI agreed to pay Plaintiff $500,000.00 in compensation plus expense reimbursements.

17.  The FBI further agreed to keep Plaintiff's identity and undercover activities strictly secret and assigned Plaintiff the codename "Blue Dagger". The FBI also agreed to place Plaintiff into the government's Witness Security ("WITSEC") program in the event his identify ever became public.

18.  The Plaintiff performed his part of the agreement. He engaged in extensive time and undercover work including hundreds of hours of taped recordings of conversations with Mr. Tran in person and over the phone as

4

well as extensive travel with Mr. Tran.  The Plaintiff
regularly met with FBI and ATF agents and the AUSA to
assist them in their investigation and prosecution efforts
of Mr. Tran.

19.   Directly as a result of Plaintiff's extensive
undercover work, the United States Attorney's Office for
the Central District of California was able to bring an
indictment against Mr. Tran in October 2008 alleging *inter
alia* various firearms offenses and interstate travel to
commit violence.  See Exhibit A.

20.   Because of Plaintiff's work and performance, the
Defendant also was able to indict Tran's accomplice Yu Sung
Park.

21.   A superseding indictment against Mr. Tran and Mr.
Park was filed on January 28, 2009.  See id.  The
Cooperating Source identified in the superseding indictment
is the Plaintiff.

22.   The trial of Mr. Tran and his accomplice Mr. Park
began on February 17, 2009.  Both Messrs. Tran and Park
subsequently were convicted on all counts alleged in the
indictment and each has been sentenced to 30 years'
imprisonment.  See Exhibit B.

23.   On or about February 17, 2009, the United States,
by and through Assistant United States Attorney Robert
Keenan, the lead prosecutor in Messrs. Tran and Park's
case, and through others unknown, materially breached the
contract with Plaintiff by knowingly and willfully
disclosing Plaintiff's true identity to the public and
press.

24.   Assistant United States Attorney Robert Keenan
shortly thereafter acknowledged to Plaintiff that AUSA

5

Keenan had "fucked up" by releasing Plaintiff's true identify to the public and press.

25. The Defendant did not keep Plaintiff's identify secret. As a direct and proximate result of this breach, Plaintiff has suffered and continues to suffer significant monetary damages as well as repeated threats on his life.

26. To date, Defendant has failed to place Plaintiff into the WITSEC program. To date, Defendant has not paid the Plaintiff $500,000.00 in compensation nor full reimbursement of his expenses.

27. The United States breached the contract with Plaintiff by failing to pay Plaintiff the agreed amount of compensation. The United States has written that it paid "close to $190,000" to Plaintiff but has not provided an accounting thereof. See Exhibit C.

28. Plaintiff avers that to date he has only received approximately $94,000.00 in expense reimbursement and $45,000.00 in actual compensation.

29. As a direct and proximate result of the United States' failure to fully compensate Plaintiff, he has and continues to suffer significant and foreseeable monetary damages.

### COUNT ONE—BREACH OF CONTRACT

30. Plaintiff repeats and re-alleges paragraphs 1 through 29 above.

31. By disclosing Plaintiff's true identity to the public and press, by failing to fully compensate Plaintiff the contracted amount, by failing to place Plaintiff into WITSEC, and by failing to pay all reimbursable expenses,

6

Defendant has materially breached its contract with
Plaintiff.

32.   The United States and the Plaintiff entered into
a contract.  The parties possessed the following:  (1)
mutuality of intent including but not limited to obtaining
admissible evidence for use in prosecuting Tran and other
violators of federal law; (2) consideration not limited to
mutual promises and course of performance by Plaintiff and
the Government in prosecuting Tran; (3) unambiguous offer
and acceptance by the respective parties; and, (4) in
performing as a Confidential Informant and otherwise
fulfilling his part of the agreement, the Plaintiff relied
on Government representatives, each of which had apparent
and actual authority to bind the Government.

33.   Both FBI and ATF officials, as well as officials
within the United States Attorney's Office for the Central
District of California, made several promises to the
Plaintiff upon which he reasonably and in good faith relied
to his detriment, and which were later breached.  The
promises included to maintain the secrecy of the
Plaintiff's true identity and to protect him from harm or
injury.  Indeed, Defendant went so far as to file a motion
for and successfully obtain a protective order precluding
"all persons to whom the true name of the undercover agent
has been disclosed," "shall not disclose the true name of
the undercover agent to anyone."  See Exhibit D.  Defendant
expressly violated this very court order it had sought.
The promises also included to pay the Plaintiff
compensation of $500,000.00 plus reimburse all his
expenses.

7

34.  Use of informants, protection of them, and
payment to them, is an accepted and routine practice of the
FBI and of Offices of United States Attorneys and an
integral part of their duties.  These law enforcement
officials and prosecutors cannot perform their assigned
tasks of undercover investigation and prosecution of
federal crimes without such authority.  Such authority is
limited to the Office of the United States Attorney and to
special agents, such as FBI and ATF agents and not provided
to other employees.

35.  The FBI and ATF agents and the AUSA in making
these promises, supervising Plaintiff, and investigating
and prosecuting Tran complied with the provisions of the
Attorney General's Guidelines on Use of Confidential
Informants including but not limited to seeking proper
level authority for monetary payments.

36.  The FBI agents making these promises had
authority to bind the United States to these promises.  The
United States Attorney for the Central District of
California and his Assistant United States Attorneys (AUSA)
made promises and ratified the promises of the federal
agents.  The AUSAs and the U.S. Attorney had authority to
ratify the promises and to bind the United States to these
promises.

WHEREFORE, Plaintiff demands judgment for damages from
breach of contract, costs and such other and further relief
as the Court deems just and proper.

## COUNT TWO—BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

8

37.  Plaintiff repeats and re-alleges paragraphs 1 through 36 above.

38.  The Defendant's agents and AUSA were acting within scope of their employment and consistent with the Attorney General's Guidelines on Use of Confidential Informants when they sent the Plaintiff into harm's way.

39.  The Attorney General's Guidelines on Use of Confidential Informants (Guidelines) issued in 2001 and 2002 apply to the use of confidential informants in criminal investigations and prosecutions by Department of Justice law enforcement agencies but also by federal prosecuting offices.  The Guidelines apply to and govern FBI and ATF agents, and federal prosecutors who made promises to the Plaintiff and with whom he worked.

40.  By disclosing Plaintiff's true identity to the public and press, by failing to fully compensate Plaintiff the contracted amount, and by failing to place Plaintiff into WITSEC, the Government breached its duty of good faith and fair dealing inherent in implied-in-fact contracts with confidential informants by not following its own established, recognized, and accepted operating procedures and protocol.

41.  As a result of these violations, Plaintiff has directly and proximately suffered financial and psychological, emotional and physical damages.

WHEREFORE, Plaintiff demands judgment for compensatory damages, costs and such other and further relief as the Court deems just and proper.

9

## COUNT THREE—FAILURE TO FOLLOW ESTABLISHED PROCEDURES WITH
## RESPECT TO CONFIDENTIAL INFORMANTS

42.  Plaintiff repeats and re-alleges paragraphs 1
through 41 above.

43.  The Department of Justice Guidelines for Use of
Confidential Informants is a regulation issued pursuant to
the Attorney General's statutorily-granted authority and
otherwise enforceable under law.

44.  By disclosing Plaintiff's true identity to the
public and press, by failing to fully compensate Plaintiff
the contracted amount, and by failing to place Plaintiff
into WITSEC, Defendant failed to follow the established
procedures by the Department of Justice Guidelines for Use
of Confidential Informants.

45  As a result of this failure to follow established
procedures with respect to confidential informants,
Plaintiff has directly and proximately suffered
psychological, financial, emotional and physical damages.

WHEREFORE, Plaintiff demands judgment for compensatory
damages, costs and such other and further relief as the
Court deems just and proper.

## COUNT FOUR—BREACH OF FIDUCIARY DUTY OF TRUST AND CARE

46.  Plaintiff repeats and re-alleges the above
paragraphs 1 through 45 above.

47.  Defendant had a special relationship with
Plaintiff by virtue of the fact it had recruited him to act
on its behalf as an undercover informant in a criminal case

10

that Defendant knew necessarily would expose Plaintiff to
potentially long-lasting significant physical harm, threats
of harm and death, and potentially permanently impair
Plaintiff's ability to financially support himself.

48. By disclosing Plaintiff's true identity to the
public and press, by failing to fully compensate Plaintiff
the contracted amount, and by failing to place Plaintiff
into WITSEC, Defendant knowingly breached its fiduciary
duty of trust and care it owed to Plaintiff.

49. As a result of this breach of duty and care,
Plaintiff has directly and proximately suffered
psychological, financial, emotional and physical damages.

[INTENTIONALLY LEFT BLANK]

WHEREFORE, Plaintiff demands judgment for compensatory damages, costs and such other and further relief as the Court deems just and proper.

DATED this 12th day of July, 2010

Respectfully submitted,

Mark H. Allenbaugh, Esq.
ALLENBAUGH SAMINI GHOSHEH, LLP
17900 Von Karman Ave., Suite 150
Irvine, CA 92614
(714) 654-9474 (telephone)
(714) 464-4463 (facsimile)
Email: mallenbaugh@alsalaw.com

William S. Aramony, Esq.
LAW OFFICES OF WILLIAM S. ARAMONY
100 North Pitt St., Suite 200
Alexandria, VA 22314
(703) 299-8496 (telephone)
(703) 299-8498 (facsimile)
Email: billcfr@verizon.net
OF COUNSEL

12

Petitioner's Exhibits
Page 12

PRIORITY MAIL
POSTAGE REQUIRED

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

UNITED STATES
POSTAL SERVICE®



9405 5102 0088 1398 0417 23



USPS TRACKING #

SANTA ANA CA 92701-4500
411 W 4TH ST
ROOM 1-053
UNITED STATES COURTHOUSE
CLERK OF THE COURT
**Ship To:**

DEPUTY

NOV 2 6 2014

SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT
REQUIRED 3

0006

Matton Law Offices
20 N. Clark Street
Suite 1420
Chicago IL 60602-4200

**PRIORITY MAIL 2-DAY™**

endicia.com/mac

071M0074613A



US POSTAGE AND FEES PAID
NOV 24 2014       Mailed from ZIP 60602
Flat Rate Envelope, Priority Mail
Commercial Base Pricing

CR-lw?

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

EP14F July 2013
OD: 12.5 x 9.5

# PRIORITY
# ★ MAIL

DATE OF DELIVERY SI

USPS TRACKING™ INC

INSURANCE INCLUDE

PICKUP AVAILABLE

* Domestic only

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.



P S00001000014





UNITED STATES
POSTAL SERVICE

# PRIORITY
## ★ MAIL ★

## FLAT RATE ENVELOPE
### ONE RATE ★ ANY WEIGHT×

EP14F July 2013
OD: 12.5 x 9.5

P S 0 0 0 0 1 0 0 0 0 0 1 4